UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NATIONAL CITY BANK,

       Plaintiff/Counter-Defendant,

vs.

Case No. 07-CV-12438

HON. GEORGE CARAM STEEH

SYATT REALTY GROUP, INC.;
FAIRFIELD & BANKS REAL ESTATE
GROUP; LLC, FAIRFIELD & BANKS
FUND MANAGER, LLC; LISA WRIGHT;
GLEN WRIGHT; and DELBERT SAULTER,

       Defendants,
and

GLEN WRIGHT,

       Counter-Plaintiff,
and

GLEN WRIGHT,

       Cross-Plaintiff,

vs.

SYATT REALTY GROUP, INC.; FAIRFIELD &
BANKS REAL ESTATE GROUP, LLC.; LISA
WRIGHT; and DELBERT SAULTER,

       Cross-Defendants.

_____/

ORDER DENYING DEFENDANT GLEN WRIGHT'S MOTION
FOR SUMMARY JUDGMENT AGAINST PLAINTIFF NATIONAL
CITY [DOC. 99], DENYING WRIGHT'S MOTION FOR PARTIAL SUMMARY
JUDGMENT ON BREACH OF THE PROMISSORY NOTE [DOC. 108] AND
GRANTING NATIONAL CITY'S MOTION FOR PARTIAL SUMMARY
JUDGMENT ON BREACH OF THE PROMISSORY NOTE [DOC. 109]

This case arises out of a loan transaction involving plaintiff National City Bank on one side and defendants Glen Wright, Lisa Wright, Delbert Saulter, and their corporate entities, Syatt Realty Group, Fairfield & Banks Real Estate Group, and Fairfield & Banks Fund manager LLC on the other side. The matter is presently before the court on defendant Glen Wright's motion for summary judgment against National City Bank and cross motions for summary judgment on breach of the promissory note filed by National City and Wright.

## FACTUAL BACKGROUND

Glen Wright is a self-employed financial planner who splits his time between Tennessee and Detroit. In 2004, Mr. Wright reconnected with his cousin Lisa Wright at a family function, and they discussed doing business together. Mr. Wright and his business partner owned Winfrey & Wright Financial Services in Tennessee, while Lisa and her business partner Delbert Saulter owned Syatt Realty Group in Southfield, Michigan. Wright opened a Michigan office for Winfrey & Wright, and informally rented space from Syatt. Winfrey & Wright was eventually dissolved. Wright formed a new financial services company in Michigan called Worth Financial in January 2006. Worth Financial continued to share office space with Syatt until December, 2006.

Wright admits that in 2005, he, Lisa and Saulter began discussing various real estate investment options. (Wright dep., 88-89). Saulter testified that the three of them decided to form a real estate investment trust ("REIT") called Fairfield & Banks. Lisa and Saulter both testified that Wright was a partner in Fairfield & Banks. (Lisa Wright dep., 63-64, 68-70; Delbert Saulter dep., 56-59). Lisa explained that Wright, as a Certified Financial Planner, would find investors, and in return they would pay him a

commission. (Lisa Wright dep., 107-08). Wright is listed on Fairfield & Banks' offering memorandum as its financial advisor. Wright solicited clients to invest in the real estate trust, including Dr. Jaunita Buford, who invested $50,000 in Fairfield & Banks. (Wright dep., 200-203).

In February 2005, Wright and Lisa bought a house together, known as the Avon Property. Syatt brokered the mortgage deal, and they used Wright's financial information to borrow the money to buy the Avon Property. Wright gave Lisa power of attorney to sign all of the documents on his behalf at the closing. (Wright dep., 62). The Avon property was renovated and sold, and Wright made a profit of $5,000 on the deal.

In June 2005, Saulter learned about a distressed sale opportunity and pitched the idea to Lisa and Wright of buying the Webber Property and selling it quickly for a profit. (Lisa Wright dep., 162-66). The three agreed to use Wright's credit profile and financial information because it was stronger than Lisa and Saulter's (Saulter dep., 58-62), but all three of them were involved in the Webber Property transaction. (Saulter dep., 78; Lisa Wright dep., 168-70). The proceeds from the deal would be used to fund Fairfield & Banks. (Saulter dep., 56, 61-62).

On June 30, 2005, a Personal Financial Statement for Glen Wright, signed by Glen Wright, was submitted to National City Bank. The statement contained false information, including listing Wright's income as $650,000, when it was really $250,000. (Wright dep., 104). Saulter testified that Wright was present when a fraudulent appraisal for the Webber Property was submitted to National City. (Saulter dep., 77).

Mark Clark was the Vice President of the Private Client Group at National City's Birmingham, Michigan location.  Clark was a private banker, who worked with high profile bank customers.  While employed at National City, Clark allegedly participated in several fraudulent loan transactions, which caused him to be sued directly by National City and several customers.  Clark testified that he met with Wright, Lisa and Saulter in person prior to the loan closing on the Webber Property.  Clark understood the three to be business partners doing real estate investment deals together.  (Clark dep. 9-21-2009, 38-43).

Wright testified that he signed blank loan documents, given to him by Lisa, which he believed were part of the application process.  (Wright dep. 119, 123, 128, 143-44).  Wright initially testified that he did not fill out the forms, they were not in his handwriting, and the initials and signature did not look like his.  After reviewing the documents, he testified that the signature on each of the loan documents was his.  Wright then explained that when he signed the documents they were blank and he only had the signature pages in front of him.  (Wright dep., 129-39).

The documents which admittedly contained Wright's signature included: the Fixed Rate Consumer Note and Security, the Future Advance Mortgage, the Good Faith Estimate of Closing Costs, the Settlement Statement, the Servicing Disclosure Statement, and the Notice of the Right to Cancel.  (Wright dep., 129-39).  Wright testified he is familiar with the lending process, from the taking of applications to closing a loan, and he would not expect to see a promissory note, a mortgage, and a good faith estimate as part of the application process.  (Wright dep., 33-36, 127-28, 135-36).

Geoff Jakiel, National City's manager of underwriting, testified that there is no way to obtain blank loan documents at a local National City branch, because loan documents are created in Cleveland, Ohio. (Jakiel dep., 53-54). Therefore, the only type of document Wright could have signed "in blank" was an initial loan application.

Clark testified that his role in the application process was to submit the loan package to the underwriting department for approval. Clark submitted Wright's loan application to Geoff Jakiel. Jakiel testified that Wright's loan approval was subject to two conditions: (1) that the bank take a second lien on the Webber Property, and (2) that the first mortgage on the property not be greater than $293,000.00. (Jakiel dep. 22-23; Officer Approval Memo, NC 084). Jakiel granted this conditional approval and sent the loan package back to Clark to follow up on the conditions. Clark testified that he did nothing further other than to distribute the money as directed by Wright. (Wright dep. 83-84). The Title Commitment on the Webber Property shows a first mortgage in the amount of $655,000.00.

The loan documents are dated August 2, 2005, and were notarized by Clark on August 9, 2009. According to Clark's affidavit:

> [with] regard to Glen E. Wright II, I never personally witnessed Mr. Wright sign any of the documents which are part of the loan at issue in this matter, including but not limited to the page attached to this affidavit as Exhibit A . . . I have no personal knowledge of Mr. Wright having been present at the bank for a closing or for the signing of these documents . . . The notary signature and information appearing on these documents are mine.

(Clark Aff. ¶5, 7, 8). Clark testified in his deposition that he "does not remember the loan" or whether Wright was present at the bank. (Clark dep. 65).

5

Wright claims he was not in Michigan to attend the closing, but Clark's secretary, National City Bank employee Aderenne Williams-English, saw a person she assumed to be Wright at the closing. She made a copy of Wright's driver's license for identity verification purposes. (Williams-English dep., 68-76).

Williams-English testified that Clark instructed her to prepare three checks on the Settlement Statement as follows: (1) $350,000 to Syatt Realty, (2) $130,000 to Fairfield & Banks, (3) $20,000 to Glen Wright. The checks are dated August 8, 2005. The same day the $130,000 was deposited into Fairfield & Banks' account from the Webber Property loan, $53,000 was withdrawn and used to pay back disgruntled Fairfield & Banks' investor, Dr. Juanita Buford. Wright was responsible for getting Dr. Buford to invest in Fairfield & Banks in the first place.

Wright acknowledges he received a National City check for $20,000 from Lisa, but he was told by Lisa that it was a commission check from the "Avon Property" deal. Wright claims he was told by Saulter that the loan application for the Webber Property had not been approved. (Wright dep. 123-24). Wright also claims that he did not discover that National City had processed the loan until 2006, when he applied for a Southwest Airlines credit card.

Exhibit Q to National City's response to Wright's motion for summary judgment is a Uniform Residential Loan Application. The application is for a loan of $50,000 for property located at 4605 Sundown Lane, in Memphis, Tennessee. The borrower is Glen Wright, and the application is dated February 28, 2006, approximately six months after the National City loan closed. In the liabilities section of the application, the National City loan is listed as having an unpaid balance of $505,955, and a monthly

6

payment of $2,957. The schedule of real estate owned includes only one property - 53 Webber Place - with a mortgage listed as $506,000, and a mortgage payment of $2,957. The application is signed by Glen Wright, and each page is initialed by Wright.

It is Wright's theory that Clark abused his position at National City by authorizing disbursement of a loan that was never approved by the bank, and distributing the loan proceeds directly to Syatt and Fairfield & Banks, who were not parties to the loan documents. Lisa notarized a Quit Claim Deed to the Webber Property and recorded it on August 16, 2005. Lisa and Saulter paid Clark $55,000 out of their company, Valulist, for what Wright claims was a kick-back to Clark from the loan proceeds relating to the Webber Property.

National City Bank filed this lawsuit against Syatt Realty, Fairfield & Banks Real Estate Group, Fairfield & Banks Fund Manager, Lisa Wright, Glen Wright and Delbert Saulter. Count One alleges bank fraud by intentional or innocent misrepresentation by Glen Wright. National City alleges that Wright made false representations regarding his level of income and his ownership of the "Webber Place Property" in order to induce National City to enter into the loan transaction. Counts Two and Three are based on the allegation that National City mistakenly paid $40,000 to Syatt, which was received by Syatt, Fairfield & Banks, Lisa Wright and Delbert Saulter. This allegation arises from a loan involving non-party Keith McKenzie, and does not involve Glen Wright. Count Four alleges unjust enrichment against all defendants in the amount of $540,000. Count Five alleges civil conspiracy against all defendants. Count Six alleges breach of promissory note against Glen Wright.

Glen Wright filed a counterclaim against National City Bank alleging a violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq., and negligence in reviewing and approving the loan to him. Wright also filed a cross claim against the other defendants, alleging fraud in falsifying documents to represent that Wright was applying for a loan with National City Bank. Wright seeks additional damages to his reputation and credit report arising out of defendants' actions.

Wright filed a motion for summary judgment against National City Bank, arguing that he should prevail on the claims stated against him, including fraudulent/innocent misrepresentation, unjust enrichment, and civil conspiracy. Wright and National City Bank filed cross-motions for summary judgment on National City's claim of breach of promissory note. This court heard oral argument on the motions on January 13, 2010.

On December 21, 2009, clerks entry of default was entered against Fairfield & Banks, Syatt Realty, Lisa Wright and Delbert Saulter upon the motion of National City Bank.

## STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored

procedural shortcut. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986); see also Cox v. Kentucky Dept. of Transp., 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Redding, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also National Satellite Sports, Inc. v. Eliadis, Inc., 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270 (1968); see also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. Anderson, 477 U.S. at 248,

252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. McLean, 224 F.3d at 800 (citing Anderson, 477 U.S. at 252).

## ANALYSIS

### I. Fraudulent/Innocent Misrepresentation

To establish a claim of fraudulent misrepresentation, a plaintiff is required to prove that (1) defendant made a material representation; (2) the representation was false; (3) defendant knew, or should have known, that the representation was false when making it; (4) defendant made the representation with the intent that plaintiff rely on it; (5) plaintiff acted on the representation; and (6) plaintiff incurred damages as a result. Foreman v. Foreman, 266 Mich. App. 132 (2005).

To establish a claim for innocent misrepresentation, the following elements must be shown: (1) the misrepresentation was made by one party to another in a transaction between them, i.e., privity of contract; (2) the misrepresentation must have been false in fact, but the misrepresenting party does not have to know that the statement was false when it was made; (3) the misrepresentation must actually deceive the other party and they must rely on it, but the misrepresentation does not need to have been made with the intent to deceive; and (4) the injury suffered by the victim must inure to the benefit of the misrepresenter. United States Fidelity & Guaranty Co. v. Black, 412 Mich. 99, 116-19 (1981). Unlike with fraud, with innocent misrepresentation "it is unnecessary to prove separately that the representer intended that the victim rely on the misrepresentation, because the representation must be made 'in a transaction between them,' where the misrepresenter should realize the misrepresentation would be relied upon." Id. at 118-19.

It is undisputed that falsified financial information, including fraudulent tax returns and a forged appraisal, was submitted to National City. Wright acknowledged that this sort of information is material to a bank when determining whether to lend money. (Wright dep., 33-35). National City relied on the representations that Wright had the financial wherewithal to make the loan payments each month, and it also relied on the property appraisal in lending $500,000 against the Webber Property. Because the parties are in privity of contract, the reliance and intent elements are unnecessary. National City can recover based solely on the giving of misinformation, whether or not it was done fraudulently.

Wright maintains that National City could not have relied on any of his representations because the loan was only conditionally approved, and the conditions were not met. Wright attacks National City's internal protocol, and argues that the breach of protocol somehow breaks the chain which would make him responsible for the misrepresentations. Specifically, Wright would have the court conclude that the loan was not approved by National City. As described by Geoff Jakiel, the loan approval was subject to two conditions, one of which that the first mortgage on the Webber Property not be greater than $293,000. The Title Commitment shows that the Webber Property had a first mortgage in the amount of $655,000, so National City was not supposed to approve the loan.

Wright's argument fails because the documents he submitted to National City as part of a loan transaction, which bear his signature and contain false information, were relied on by National City in approving the loan. The fact that National City's internal conditions were not met is of no import. National City has the sole authority to waive its

11

internal conditions if it so desired. As a party to the transaction, Wright is assumed to have known that National City would rely on his representations. The bottom line is that a fully-executed loan document exists, National City disbursed $500,000 in accordance with the loan documents, and Wright accepted a portion of the loan proceeds directly (and indirectly accepted the remainder of the loan proceeds through business entitles in which he was a partner).

The court denies Wright's motion for summary judgment on fraudulent and innocent misrepresentation.

## II. Unjust Enrichment

National City pled unjust enrichment in the alternative, if there is an infirmity in the loan agreement.

The essential elements of an unjust enrichment claim are: "(1) receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to [the] plaintiff because of the retention of the benefit by defendant." Barber v. SMH, Inc., 202 Mich. App. 366, 375 (1993). "In such instances, the law operates to imply a contract in order to prevent unjust enrichment." Id. "However, a contract will be implied only if there is no express contract covering the same subject matter." Id.

In this case there is an express contract governing the subject matter - the Webber Property loan transaction documents, including the promissory note. Therefore, the court need not address National City's unjust enrichment claim further.

## III. Civil Conspiracy

The elements of a cause of action for civil conspiracy in Michigan are (1) a concerted action (2) by a combination of two or more persons (3) to accomplish an

unlawful purpose or a lawful purpose by criminal or unlawful means (4) causing damage to the plaintiff. Fenestra, Inc. v. Gulf Am. Land Corp., 377 Mich. 565, 593 (1966); Mays v. Three Rivers Rubber Corp., 135 Mich. App. 42, 48 (1984). In a civil conspiracy, the agreement to do the unlawful act is the thing which must be proved, but "[d]irect proof of agreement is not required . . . nor is it necessary that a formal agreement be proven." Temborius v. Slatkin, 157 Mich. App. 587, 600 (1986). Instead, circumstantial evidence can establish the conspiracy. Id.

National City has submitted evidence to support each of the required elements of civil conspiracy. Lisa and Saulter testified that the agreement between themselves and Wright was to use Wright's financial information to obtain a mortgage from National City, and then use the proceeds to fund their REIT, Fairfield & Banks. Lisa and Saulter further testified that all three of them were involved in the Webber Property transaction, and all three were responsible to pay National City back for the loan transaction.

Wright has failed to demonstrate that there is no issue of material fact with regard to the elements of a civil conspiracy cause of action against him. The court denies Wright's motion for summary judgment as to civil conspiracy.

IV. Breach of Promissory Note

The promissory note at issue in this case is a negotiable instrument governed by Article 3 of the Uniform Commercial Code. A "negotiable instrument" is an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges, if (1) it is payable to bearer or to order at the time it is issued or first comes into possession of a holder; (2) it is payable on demand or at a definite time; and (3) it does not require any other undertaking by the person promising payment in

addition to the payment of money, other than with regard to any collateral to secure payment.  MCL 440.3104(1).

Article 3 provides an expedited basis for the enforcement of a negotiable instrument.  In an action to enforce a promissory note, "the authenticity of, and authority to make, each signature on the instrument is admitted unless specifically denied in the pleadings."  MCL 440.3308(1).  Once the validity of the signatures is deemed admitted, then "a plaintiff producing the instrument is entitled to payment if the plaintiff proves entitlement to enforce the instrument under section 3-301 unless the defendant proves a defense or recoupment."  MCL 440.3308(2).  A plaintiff is entitled to enforce an instrument if he is the "holder" of it.  MCL 440.3301.  A person is the "holder" if the instrument is "payable to an identified person," and that person is in possession of the instrument.  MCL 440.1201(20).  Where the "parties agree that the note is a negotiable instrument, and that plaintiffs are holders" and "the signatures on the note are not in dispute," then "plaintiffs are entitled to recover by merely producing the note."  Behrens v. Appessos, 39 Mich. App. 426, 428-29 (1972).

In this case, National City loaned Wright $500,000 as evidenced by the promissory note.  The promissory note constitutes a "negotiable instrument" under Article 3 - it is an unconditional promise to pay money, payable on demand to the order of National City, and it does not require any additional undertakings by Wright.  Wright acknowledged he signed the promissory note.  (Wright dep., 130).  National City maintains it is therefore entitled to enforce the note by producing it, and is entitled to summary judgment.

14

Wright's response is that the note he allegedly signed was materially altered by National City's personnel, such that it is not enforceable against him.  Relief is provided for innocent victims who have been defrauded by a material alteration of a negotiable instrument.  MCL 440.3407.  When Wright signed the loan documents, he was entering into a personal line of credit for $500,000, that only he was authorized to draw upon.  After Wright signed the documents, Clark's secretary, Ms. Williams-English, filled in the blanks under "Additional Items" on the settlement statement, indicating that loan proceeds were distributed to Syatt Realty and Fairfield & Banks.  Ms. Williams-English testified she was directed to do this by Mr. Clark.  Wright argues that he did not know about, or authorize, disbursements to anybody else.  Wright argues that this alteration of the terms of the loan documents, adding payee designations, materially changed Wright's obligation.  However, the disbursement information was added to the settlement statement, not to the promissory note.  (Exhibit 13 to Wright's Motion for Summary Judgment, NC093).  The settlement statement is not a negotiable instrument.  There is no evidence of any alteration to the note itself.  Therefore, Wright's allegation of fraud is without merit.

It is also compelling that when Wright filled out a credit application six months after the closing on the Webber Property, he listed the National City loan as a liability, and the Webber Property as a holding.  If Wright was not aware that National City had approved his loan, he would not have listed it on a future credit application.

National City is the holder of a valid, signed, negotiable instrument in the form of the promissory note which is at issue in this case.  Summary judgment on the promissory note is granted in favor of National City and against Wright.

## CONCLUSION

Wright's motion for summary judgment is DENIED as to National City's claim of fraud or innocent misrepresentation and civil conspiracy.  As to the promissory note, the court GRANTS National City's motion for summary judgment and DENIES Wright's motion for summary judgment.

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

Dated:  February 4, 2010

## CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record on February 4, 2010, by electronic and/or ordinary mail.

s/Josephine Chaffee
Secretary/Deputy Clerk