UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NATIONAL CITY BANK,

  Plaintiff/Counter-Defendant,

vs.

Case No. 07-CV-12438

HON. GEORGE CARAM STEEH

SYATT REALTY GROUP, INC.;
FAIRFIELD & BANKS REAL ESTATE
GROUP; LLC, FAIRFIELD & BANKS
FUND MANAGER, LLC; LISA WRIGHT;
GLEN WRIGHT; and DELBERT SAULTER,

  Defendants,
and

GLEN WRIGHT,

  Counter-Plaintiff,
and

GLEN WRIGHT,

  Cross-Plaintiff,

vs.

SYATT REALTY GROUP, INC.; FAIRFIELD &
BANKS REAL ESTATE GROUP, LLC.; LISA
WRIGHT; and DELBERT SAULTER,

  Cross-Defendants.

_____/

ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT [DOC. 145] AND GRANTING PLAINTIFF/COUNTER-
DEFENDANT'S MOTION TO DISMISS COUNTERCLAIMS [DOC. 146]

  This case arises out of a loan transaction involving plaintiff National City Bank on

one side and defendants Glen Wright, Lisa Wright, Delbert Saulter, and their corporate

entities, Syatt Realty Group, Fairfield & Banks Real Estate Group, and Fairfield & Banks Fund manager LLC on the other side.  The matter is presently before the court on plaintiff/counter-defendant National City Bank's motion for summary judgment regarding its remaining claims against Glen Wright, and its motion to dismiss Wright's counterclaims.

FACTUAL BACKGROUND

Glen Wright is a self-employed financial planner who splits his time between Tennessee and Detroit.  In 2004, Mr. Wright reconnected with his cousin Lisa Wright at a family function, and they discussed doing business together.   Mr. Wright and his business partner owned Winfrey & Wright Financial Services in Tennessee, while Lisa and her business partner Delbert Saulter owned Syatt Realty Group in Southfield, Michigan.  Wright opened a Michigan office for Winfrey & Wright, and informally rented space from Syatt.  Winfrey & Wright was eventually dissolved.  Wright formed a new financial services company in Michigan called Worth Financial in January 2006.  Worth Financial continued to share office space with Syatt until December, 2006.

Wright admits that in 2005, he, Lisa and Saulter began discussing various real estate investment options.  (Wright dep., 88-89).  Saulter testified that the three of them decided to form a real estate investment trust ("REIT") called Fairfield & Banks.  Lisa and Saulter were owners of Fairfield & Banks and Wright was described as an agent.  (Lisa Wright dep., 68-70).  Lisa explained that Wright, as a Certified Financial Planner, would find investors, and in return they would pay him a commission.  (Lisa Wright dep., 107-08).  Wright also admitted to looking for a line of credit to use for real estate investments with Lisa and Saulter, as well as on his own.  (Wright dep., 87-88).  Wright

is listed on Fairfield & Banks' offering memorandum as its financial advisor. Wright solicited clients to invest in the real estate trust, including Dr. Jaunita Buford, who invested $50,000 in Fairfield & Banks. (Wright dep., 200-203). The information packet given to Dr. Buford states that it was prepared by Glen Wright on behalf of Fairfield & Banks.

In June 2005, Wright agreed to apply for a line of credit so he would have money for future deals with Lisa and Saulter. (Wright dep., 106-09). Saulter learned about a distressed sale opportunity and pitched the idea to Lisa and Wright of buying the Webber Property and selling it quickly for a profit. (Lisa Wright dep., 162-66). The three agreed to use Wright's credit profile and financial information because it was stronger than Lisa and Saulter's (Saulter dep., 58-62), but all three of them were involved in the Webber Property transaction. (Saulter dep., 78; Lisa Wright dep., 168-70).

On June 30, 2005, a Personal Financial Statement for Glen Wright, signed by Glen Wright, was submitted to National City Bank. The statement contained false information, including listing Wright's income as $650,000, when it was really $250,000. (Wright dep., 104). Wright admitted that other relevant information was also misrepresented, including:

- a fake Bank of America checking account with $32,000;

- a fake Bank of America money market account with $25,000;

- an overinflated mutual fund purportedly worth $152,940;

- fake unpaid commissions of $80,000;

- a fake primary residence listed in Nashville, Tennessee;

      - a fake investment in Ypsilanti worth $190,000;

      - an overinflated retirement account worth $145,000, but really worth less than $50,000; and

      - an overinflated life insurance policy with a face value of $500,000, but really only having a face value of $250,000.

(Wright dep., 112-18).

Wright claims he signed a blank loan application form and that Lisa asked him over the phone what information to list on it regarding assets and liabilities. (Wright dep., 119). However, among the documents which admittedly contained Wright's signature were: the Fixed Rate Consumer Note and Security (Bates No. NC094), the Future Advance Mortgage (NC091), the Good Faith Estimate of Closing Costs (NC092), the Settlement Statement (NC094), the Servicing Disclosure Statement, and the Notice of the Right to Cancel (NC096). (Wright dep., 129-39). Wright testified he is familiar with the lending process, from the taking of applications to closing a loan, and he would not expect to see a promissory note, a mortgage, and a good faith estimate as part of the application process. (Wright dep., 33-36, 127-28, 135-36). However, he did testify that his signature appeared on each document and he believed that every document he signed was blank and was part of the application process. (Id).

Geoff Jakiel, National City's manager of underwriting, testified that there is no way to obtain blank loan documents at a local National City branch, because loan documents are created in Cleveland, Ohio. (Jakiel dep., 53-54). Therefore, the only

type of document Wright could have signed "in blank" was an initial loan application, contrary to Wright's belief.

When the $500,000 loan proceeds were distributed, Wright received a certified check for $20,000 from National City which read "LOAN PROCEEDS" on the remitter line. Wright claims that he believed the $20,000 check was for commissions on a project known as the Avon Property. The rest of the proceeds were distributed as follows: $350,000 to Syatt and $130,000 to Fairfield & Banks - both companies that Wright was associated with, along with Lisa and Saulter. Of the $350,000 that went to the Fairfield & Banks bank account, $53,000 was immediately withdrawn and used to pay back Dr. Juanita Buford, one of Wright's investment clients from Tennessee. According to National City Bank, additional funds totaling $60,880.07 were later disbursed by Fairfield & Banks and Syatt to Wright's company, Worth Financial including: $4,380.07 on February 2, 2006; $11,500 on February 2, 2006; $25,000 on February 24, 2006; and $20,000 on December 19, 2006. The checking withdrawal slip for the $11,500 payment from Syatt to Wright is signed by Lisa and says "Glen's commission."

On February 28, 2006, six months after the loan closed, Wright listed the $500,000 National City loan on a credit application he allegedly filled out for an investment property he bought in Tennessee. (Sundown Lane Application). Wright listed Webber Place as his "2nd home" and listed the unpaid balance for the loan as a current liability. However, in her deposition, Lisa Wright states that the signature does not appear to be Glen's signature. (Lisa Wright dep., p. 144). Wright states that his signature is not on the loan application, and claims to have a handwriting expert who will

5

verify that it is not his signature. Wright does admit that he purchased the house at Sundown Lane on his own and that Lisa Wright was the broker on the deal. (Wright dep., 156).

Glen Wright avers that National City Vice President, Mark Clark, who has been fired by the bank, was involved in several fraudulent schemes and is an admitted liar. Wright's theory is that Lisa and Saulter, with the help of Mark Clark, fraudulently borrowed money from National City, using Wright's name and credit information, paid Wright $20,000, and spent the rest of the $480,000 themselves.

The court has previously entered summary judgment against Glen Wright with respect to National City's breach of promissory note claim. The court will not revisit its ruling that Wright signed the promissory note and is liable on the note. National City now moves for summary judgment on its remaining causes of action against Wright, including fraud, innocent misrepresentation and civil conspiracy. Wright filed a counterclaim against National City alleging violation of the Fair Credit Reporting Act and negligence. National City also moves for dismissal of these counterclaims.

## STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored

procedural shortcut. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986); see also Cox v. Kentucky Dept. of Transp., 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Redding, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also National Satellite Sports, Inc. v. Eliadis, Inc., 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270 (1968); see also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. Anderson, 477 U.S. at 248,

7

252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. McLean, 224 F.3d at 800 (citing Anderson, 477 U.S. at 252).

## ANALYSIS

I. Fraud and Innocent Misrepresentation

To establish a claim of fraudulent misrepresentation, a plaintiff is required to prove that (1) defendant made a material representation; (2) the representation was false; (3) defendant knew, or should have known, that the representation was false when making it; (4) defendant made the representation with the intent that plaintiff rely on it; (5) plaintiff acted on the representation; and (6) plaintiff incurred damages as a result. Foreman v. Foreman, 266 Mich. App. 132 (2005).

To establish a claim for innocent misrepresentation, the following elements must be shown: (1) the misrepresentation was made by one party to another in a transaction between them, i.e., privity of contract; (2) the misrepresentation must have been false in fact, but the misrepresenting party does not have to know that the statement was false when it was made; (3) the misrepresentation must actually deceive the other party and they must rely on it, but the misrepresentation does not need to have been made with the intent to deceive; and (4) the injury suffered by the victim must inure to the benefit of the misrepresenter. United States Fidelity & Guaranty Co. v. Black, 412 Mich. 99, 116-19 (1981). Unlike with fraud, with innocent misrepresentation "it is unnecessary to prove separately that the representer intended that the victim rely on the misrepresentation, because the representation must be made 'in a transaction between them,' where the misrepresenter should realize the misrepresentation would be relied upon." Id. at 118-19.

8

In this case, Wright admitted that his loan application contained fraudulent misrepresentations regarding his assets and liabilities, including his salary, bank account balances, and investment assets. (Wright dep., 104, 112-18). Wright claims that he signed the loan application documents in blank, and that they were fraudulently filled out by Lisa. Wright admitted that he knew this type of financial information was important in the loan application process and that lenders rely in this type of information when deciding whether to loan someone money. (Wright dep., 33-35). In addition, Wright admitted to granting National City a mortgage on the Webber Place property, a home that he never rightfully owned. (Wright dep., 126-40; 154-55).

As the court previously found:

[i]t is undisputed that falsified financial information, including fraudulent tax returns and a forged appraisal, was submitted to National City. Wright acknowledged that this sort of information is material to a bank when determining whether to lend money. (Wright dep., 33-35). National City relied on the representations that Wright had the financial wherewithal to make the loan payments each month, and it also relied on the property appraisal in lending $500,000 against the Webber Property. Because the parties are in privity of contract, the reliance and intent elements are unnecessary. National City can recover based solely on the giving of misinformation, whether or not it was done fraudulently.

. . . .

As a party to the transaction, Wright is assumed to have known that National City would rely on his representations. The bottom line is that a fully-executed loan document exists, National City disbursed $500,000 in accordance with the loan documents, and Wright accepted a portion of the loan proceeds directly (and indirectly accepted the remainder of the loan proceeds through business entitles in which he was a partner).

(Doc. 124, Opinion, 11-12). This last part about being a partner is now disputed, however, there is no dispute that Wright was significantly involved in business ventures with Lisa and Saulter, and both Syatt and Fairfield & Banks.

9

It is also undisputed that fraudulent information was submitted in connection with the National City line of credit. The source of the misrepresentation is not material where the defendant signed the application containing the false information.  For innocent misrepresentation, intent to deceive is not an element that must be proven.  In this case there is privity of contract between National City Bank and Wright, there are misrepresentations which deceived the bank, and there is reliance by the bank upon those misrepresentations.

The court finds there is sufficient evidence of intent in this case as well.  Taking Wright's version of the facts as true, Wright gave Lisa a blank, signed, loan application with the intent that National City Bank would extend him a line of credit.  He knew that National City Bank would rely on the information contained in the loan application, and he entrusted Lisa to fill it out on his behalf.  Therefore, Wright intended that the Bank would rely on whatever information was presented above his signature in lending him the $500,000.

Finally, plaintiff must establish that the injury it suffered inured to the benefit of the misrepresenter, Wright.  Clearly, Wright received $20,000 in the form of a check from National City Bank, labeled "LOAN PROCEEDS".  The remaining $480,000 went to entities in which Wright had an admitted relationship, as investment advisor and agent. Fifty-three thousand dollars of this remainder was used to pay Wright's investment client, Dr. Buford, $60,800 went to Wright-controlled Worth Financial, and $20,000 was paid directly to Wright, for a total of $138,880.  Wright solicited investors, was paid commissions by, and was himself an investor in Syatt and Fairfield & Banks.  Wright

has failed to plausibly dispute the overwhelming evidence establishing the elements of the misrepresentation claims.

Summary judgment is GRANTED in favor of National City Bank on its fraud and innocent misrepresentation claims.

## II. Civil Conspiracy

The elements of a cause of action for civil conspiracy in Michigan are (1) a concerted action (2) by a combination of two or more persons (3) to accomplish an unlawful purpose or a lawful purpose by criminal or unlawful means (4) causing damage to the plaintiff. Fenestra, Inc. v. Gulf Am. Land Corp., 377 Mich. 565, 593 (1966); Mays v. Three Rivers Rubber Corp., 135 Mich. App. 42, 48 (1984). In a civil conspiracy, the agreement to do the unlawful act is the thing which must be proved, but "[d]irect proof of agreement is not required . . . nor is it necessary that a formal agreement be proven." Temborius v. Slatkin, 157 Mich. App. 587, 600 (1986). Instead, circumstantial evidence can establish the conspiracy. Id.

National City has submitted evidence to support each of the required elements of civil conspiracy. Lisa and Saulter testified that the agreement between themselves and Wright was to use Wright's financial information to obtain a mortgage from National City, and then use the proceeds to fund their REIT, Fairfield & Banks. Lisa and Saulter further testified that all three of them were involved in the Webber Property transaction, and all three were responsible to pay National City back for the loan transaction.

For his own part, Wright concurred with Lisa and Saulter's version of the story and admitted that the agreement was for him to apply for a line of credit loan, and the proceeds would be used for future real estate deals for the three of them. (Wright dep.,

106-09). Once parties to a conspiracy have agreed to conspire, all acts done in furtherance of the conspiracy by one of the conspirators "is to be considered as the act of all, and all are liable irrespective of the fact that they did not actively participate therein or the extent to which they benefitted thereby." Warsop v. Cole, 292 Mich. 628, 636 (1940).

Summary judgment is GRANTED to National City Bank on its civil conspiracy claim.

### III. Fair Credit Reporting Act

Glen Wright brought a counterclaim against National City Bank, in which he alleges the bank violated the Fair Credit Reporting Act ("FCRA"). Banking institutions are not considered reporting agencies under the FCRA. Daniels v. Charter One Bank, 39 Fed. Appx. 223, 225 (6th Cir. 2002). In affirming a dismissal of a FCRA claim against a bank, the Sixth Circuit reasoned:

> To the extent that a bank reports "information based solely on its own experience with one of its customers, the Bank is not acting as a 'consumer reporting agency' within the meaning of the Fair Credit Reporting Act, because, *inter alia*, it has not furnished a 'consumer report' as that term is defined in the Act.

Id. at 225. National City Bank is not a "reporting agency," and is therefore not governed by the FCRA. Wright's claim is DISMISSED for failure to state a claim.

### IV. Negligence

Wright's counterclaim also alleges that National City Bank negligently handled the loan in this case by not "exercising due care and due diligence in its review of and approval of the above-mentioned loan." (Counterclaim ¶ 1). However, Michigan law

does not impose a legal duty between a lender and a borrower, so there can be no breach of duty for purposes of stating a negligence claim.

In Farver v. Citizens Bank, 2002 Mich. App. LEXIS 776 (Mich. Ct. App. 2002), the plaintiff alleged that lenders owed borrowers a duty "to follow reasonably recognized banking practices," but the court held that a lender owed no such duty of care. Id. at *15. The court dismissed the borrower's negligence count because "no independent legal duty exists to support a negligence claim." Id.

Wright's arguments that the bank ignored several red flags in this loan application, and did not follow their own internal guidelines in granting him a line of credit, fail because the bank does not have a legal duty to exercise a certain standard of care to a borrower. Wright's negligence counterclaim fails as a matter of law and is DISMISSED.

V. Miscellaneous

Wright raises many issues that are irrelevant to National City's fraud, innocent misrepresentation and civil conspiracy claims. For example, Wright contends that as the named borrower on the loan documents, he is the only person authorized to draw on the line of credit, and National City should not have issued checks to Syatt or Fairfield & Banks without his written authorization. However, the issue before the court is whether Wright fraudulently or innocently induced National City to extend him a line of credit against the Webber Property. What occurred *after* the line of credit was approved is not relevant to the issues before the court today.

Wright contends that loan officer Mark Clark was involved in a number of scams at National City, and that he personally profited from the line of credit issued to Wright.

However, Wright has not submitted ANY admissible evidence to support his allegations, therefore they will not be considered by the court.

Lastly, Wright refers to a handwriting expert, who would purportedly opine that the information provided in the Personal Financing Statement is not in his handwriting. However, Wright has not submitted any expert witness reports, in violation of Rule 26, nor has he asserted that this unidentified witness has even inspected the original documents in formulating an opinion.  Hence, any reference to a handwriting expert may not be considered by the court at trial or for purposes of this motion.

VI. Conclusion

For the reasons given above, plaintiff's motion for summary judgment is GRANTED, and counter-defendant's motion to dismiss the counterclaims is GRANTED.

Dated:  January 3, 2011

S/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on January 3, 2011, by electronic and/or ordinary mail.

S/Josephine Chaffee
Deputy Clerk